IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Dawn Heckman, <br><br> Plaintiff, <br><br> v. <br><br> The Village of Shannon, *et al.*, <br><br> Defendants. | Case No.: 25-cv-50404 <br><br> Judge Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dawn Heckman alleges that Butch Meinders, a trustee of the Village of Shannon, and the Village of Shannon, sexually harassed her and deprived her of her First Amendment rights. Defendants bring a 12(b)(6) motion to dismiss. As explained below, the Motion to Dismiss [9] is granted, in part, and denied, in part. The sexual harassment claims are dismissed without prejudice because, as pleaded, Meinders statements to Heckman were not made under color of law. The motion to dismiss the First Amendment claims are denied because Heckman has plausibly alleged that Trustee Meinders and Shannon retaliated against her for exercising her First Amendment rights.

**I. Background**

Unless noted, the following allegations come from Heckman's complaint, accepted as true for the purposes of this motion.

Heckman has been an active resident and member of the Village of Shannon community. For those unfamiliar with Shannon, this village is located in rural

Carroll County, Illinois. About 800 souls call Shannon home. Although small in population, Shannon is apparently not unenlightened. A village ordinance prohibits sexual harassment. Significantly, the ordinance is *not* limited to prohibiting sexual harassment in the workplace. According to the ordinance, "It is a policy of the village to prohibit harassment of *any person* by *any* municipal official, municipal agent, municipal employee or municipal agency or office on the basis of sex or gender." (Emphasis added.) The ordinance then identifies conduct that may constitute sexual harassment. The list includes, among other things, "sexual innuendos, suggestive comments, insults, humor, and jokes about sex, anatomy or gender-specific traits."

Heckman is no stranger to Shannon's Village Board and Village President. She often attended village board meetings and criticized village policies. In 2025, she ran unsuccessfully for village president, losing to Ryan Shaner.

According to the Complaint, the Shannon Village Code states, "The village president shall perform all such duties as are or may be prescribed by law, by this code or by the ordinances of the village, and shall take care that the laws, the provisions of this code and the ordinances are faithfully executed." The Complaint also alleges that, "The Village Trustees and Village President have final policy-making authority with regard to its affairs." The allegation is likely a legal conclusion that the Court need not accept as true. *See Ashcroft v. Iqbal*, 556 U.S. 622, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But the Court can take judicial notice that Illinois Municipal Code defines the "corporate

2

authorities" of an Illinois village to be "the president and trustees." 65 ILCS 5/1-1/2(2). And, generally, in Illinois, a village acts through its corporate authorities. *See Henyard v. Mun. Officers of Vill. of Dolton*, 235 N.E.3d 639, 652 (Ill. App. Ct. 2022) (Delort, J.).

Heckman's strained relationship with village officials came to a head on May 6, 2025. That night, after a village board meeting, Heckman went to a local bar. Also at the bar were Meinders, another village trustee (Steve Miller), and the village's chief of police (Michael Lewis). Heckman discussed village business with Meinders and Miller. At one point, Heckman pulled her left arm out of her shirt to show the bartender her new tattoo. Meinders saw this and said, "Here I thought you were going to whip your titties out and flash me." As Heckman then attempted to leave, Meinders said, "Sitting next to you all night has me horny, I'm going home to bother my wife." Meinders later falsely told an unnamed community member that Heckman had an inappropriate relationship with another member of the community. Meinders also allegedly told community members that he would not be held accountable for his conduct because of his position as trustee.

On June 20, 2025, Heckman met with President Shaner and Trustee Kyle Ruter and described the May 6 events at the bar. Heckman stated her opinion that Trustee Meinders' statements were made in retaliation for her active participation in village board meetings and criticism of village policies. She also told President Shaner and Trustee Ruter that because of Trustee Meinders' retaliation she decided

3

not to run for village trustee. Heckman asked the village board to discipline Trustee Meinders for his conduct, but Shannon didn't.

A few days later—on June 25, 2025— Heckman met with Chief Lewis, who was acting on behalf of the Village. Chief Lewis was empowered by Trustee Ruter (who was acting Village President due to President Shaner's absence) to act on behalf of the Village. At the meeting, Chief Lewis told Heckman that Shannon would ignore an alleged ordinance violation of Heckman's if she remained silent regarding Trustee Meinders' conduct at the bar.

The next day, Heckman sought a variance to sell ice cream from one of her businesses. But the Village never responded to her request. During the same period, the Village approved another resident's variance request. What's more, Shannon has warned Heckman about other alleged ordinance violations, while ignoring another resident's similar ordinance violations.

Later, the Village pressured Chief Lewis to misrepresent the circumstances of the June 25 meeting. According to the Complaint, Chief Lewis wouldn't do so. His refusal resulted in his suspension under the pretense of a missing receipt.

In September, President Shaner made a Facebook post mentioning allegations about the conduct of Heckman's six-year-old son, in which the child allegedly "repeated words of hostility he had clearly heard at home."

## II. Analysis

A complaint must allege enough facts to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The complaint's allegations,

4

accepted as true, must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation modified). Although plausible and probable are different, the plaintiff must do more than raise a "sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign Cnty.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (citation modified). The Court "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citation modified). The Court accepts the complaint's well pled allegations as true and makes reasonable inferences in favor of the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019).

### III. The Sexual Harassment Claims Against Butch Meinders (Count I) and the Village (Count II) are Dismissed Without Prejudice

Any claim brought under Section 1983 requires two fundamental elements: (1) plaintiffs were deprived of a right secured by the United States Constitution or federal law, and (2) the deprivation was inflicted upon plaintiffs by a person acting under color of state law. *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 480 (7th Cir. 2024). Stated differently, an action taken "under color of (state) law" is a prerequisite to a Section 1983 claim, both against an individual and a municipality.

5

*See Jordan v. Foz, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1266 (3d Cir. 1994); *Lumbreras v. Roberts*, 319 F. Supp. 2d 1191, 1203 (D. Or. 2004).

To survive Defendants' motion to dismiss, Heckman must plausibly allege that the person who deprived her of her rights was "acting under color of state law." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) (quoting *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). "A public employee's acts occur under color of state law when they relate to official duties." *Luce v. Town of Campbell, Wisc.*, 872 F.3d 512, 514 (7th Cir. 2017). Plaintiffs must allege that a municipal actor's invocation of state authority somehow facilitated or enabled the alleged misconduct. *Cielak*, 112 F.4th at 480. Plaintiffs must allege that in committing the action that deprived them of their federal rights, the municipal defendant must have been exercising power possessed by virtue of state law and made possible only because state law provided the authority to do so. *Id.* This means that Heckman must plausibly allege that Trustee Meinders' alleged sexual harassment was inflicted upon her "under color of state law." For that to happen, Meinders must have sexually harassed Heckman because he possessed this ability due to Illinois law and he was able to do so solely because he was empowered with the ability to do so because of Illinois law.

Heckman has not plausibly alleged Meinders was acting under color of state law when he allegedly made these rude, harassing, and unprofessional statements in a public bar. No state authority is needed to be a creep in a local bar. Any jamoke can do that. State law doesn't empower leches to make statements like the

6

ones Trustee Meinders is accused of making in this context. And sexual harassment certainly wasn't among Meinders' official duties. What's more, it's insufficient that the sexual harassment occurred proximately to a discussion of town business at a local bar. Instead, state authority must have "facilitated or enabled the alleged misconduct." *DiDonato v. Panatera*, 24 F.4th 1156, 1161 (7th Cir. 2022); *Honaker v. Smith*, 256 F.3d 477, 485 (7th Cir. 2001) ("[A]cts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office."). The same holds true to the extent that Heckman attempts to plead that Meinders was acting under color of law because he is a prominent figure in Shannon. *See Cielak*, 112 F.4th at 480-81; *DiDonato*, 24 F.4th at 1161.

Because Heckman hasn't pleaded any facts plausibly alleging that Meinders used state authority to facilitate or enable the alleged sexual harassment at a public bar, she hasn't plausibly alleged that Meinders was acting under color of law. Instead, she's only alleged that Meinders is a sexual creep. That the alleged sexual creep is a village trustee doesn't make his action enabled by state law.

Two recent Seventh Circuit decisions—both decided at the motion to dismiss stage—require this result. Both cases involve allegations of sexual misconduct by public employees. In *DiDonato,* a Chicago paramedic sexually assaulted the plaintiff in his apartment. In *Cielak*, in relevant part, the school official sexually assaulted the former student after the student had graduated. As with Heckman's complaint, the only allegation remotely related to the requirement that the

7

deprivation occur under color of state law was that the defendants were public officials. And that's insufficient. *Cielak*, 112 F.4th at 480; *DiDonato*, 24 F.4th at 1160.

And, just as a Section 1983 claim against an individual defendant must be based on actions under of color of law, the same is true for a claim against a municipality. *Cielak*, 112 F.4th at 480. So, Heckman has failed to state a sexual harassment claim against the Village, too. What's more, because Meinders didn't violate Heckman's constitutional rights by allegedly sexually harassing her, Shannon likewise can't be liable under Section 1983. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). "A predicate to recovery under *Monell* is, of course, a constitutional injury." *Carr v. City of North Chicago*, 908 F. Supp. 2d 926, 936 (N.D. Ill. 2012); *Doheny v. Prim*, No. 20-cv-50138, 2021 U.S. Dist. LEXIS 66232, at *11 (N.D. Ill. Apr. 6, 2021) ("Without a constitutional violation by a state actor, there can be no *Monell* claim.").

So, Counts I and II are dismissed. The dismissal is without prejudice. Generally, plaintiffs should be given an opportunity to replead before a court dismisses an action or claim with prejudice. *Abu-Shawish v. United States*, 898 F.3d 726, 728 (7th Cir. 2018).

**IV.     The Motion to Dismiss the First Amendment Claims is Denied**

To adequately plead a First Amendment retaliation claim, plaintiffs must allege that (1) they engaged in First Amendment protected activity, (2) they suffered an adverse action that would likely deter future First Amendment activity,

8

and (3) the First Amendment activity was at least a motivating factor in defendants' decision to retaliate. *Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 622 (7th Cir. 2012).

In addition to these elemental factors of a First Amendment claim, for a local government to be held liable under Section 1983, the violation must be caused by "(1) an express policy, (2) a widespread practice so well-settled it becomes a custom, or (3) a person with final policymaking authority for the local governmental body." *Moore v. Freeport Cmty. Unit Sch. Dist. No. 145*, 570 F. Supp. 3d 601, 612 (N.D. Ill. 2021) (citing *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). In addition to these three well-known ways a municipal body can be liable under Section 1983, a municipality can also be held liable under a ratification theory. *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998). Ratification occurs when a final policymaking authority approves a subordinate's decision and the basis for the decision. *Id.* State law determines what municipal officials or bodies have final policymaking authority. *Valentino v. Vill. of S. Chicago* Heights, 575 F.3d 664, 675 (7th Cir. 2009). Sometimes, federal courts find that village presidents rather than boards of trustees are the final policymakers, but not always; the decision is made case-by-case. *Id.*; *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468-69 (7th Cir. 2010). Critically, for purposes of this action, plaintiffs can plead a *Monell* claim "by showing a series of bad acts and inviting the court to infer from them that the policy-making level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned ... the

9

misconduct of subordinate officers." *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal quotation marks omitted). The Seventh Circuit has repeatedly acknowledged this manner of municipal liability under Section 1983. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009); *Estate of Vovak v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000); *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995).

To determine whether Heckman has adequately pleaded a First Amendment retaliation claim against Trustee Meinders and Shannon, the Complaint's allegations must be analyzed under the appropriate standard. Although Defendants repeatedly argue that the Complaint's allegations are conclusory, it's important to remember that no heightened pleading standard exists for *Monell* claims. *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016). What's more, despite Defendants' insinuation to the contrary, plaintiffs are not required to hang factual allegations on each element of a claim. *See Chapman v. Yellow Cab Co.*, 875 F.3d 846, 848 (7th Cir. 2017). Two more axioms require emphasis. First, a claim must only be plausible. *Indep. Trust. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). "Plausible" means less than probable but more than conceivable. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Second, a Rule 12(b)(6) movant can't credit inferences in its favor, nor can it ignore damaging well-pleaded allegations. *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F.Supp.3d 862, 895 (N.D. Ill. 2023). Finally, the Court engages in this entire process by using its judicial experience and common sense. *Iqbal*, 556 U.S. at

679. So, the Court need not don blinders to reality. *See 42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002). For example, the Court can use common sense and its own judicial experience (as well as experience as an attorney representing municipal bodies) to reasonably infer that the powers-that-be of a tiny village are far more likely to know the day-to-day interactions with residents than a city the size of Chicago. *See, e.g., Trexler v. City of Belvidere*, No. 20-cv-50113, 2021 U.S. Dist. LEXIS 12731, at *7 (N.D. Ill. Jan. 25, 2021).

Viewing the allegations in the light most favorable to Heckman and drawing all reasonable inferences in her favor, here's the version of events for the Court to analyze.

Heckman regularly attended Shannon (population 800) village board meetings. In the process, she criticized Village decisions. She even decided to run for village president, but she lost to the current village president—President Shaner. In light of small-town politics, a reasonable inference then is that Heckman and President Shaner are political rivals.

After May 2025's village board meeting, Heckman went to a local bar. She was soon joined by not one, but two, village trustees, who Illinois law identifies as part of the corporate authorities. Along with the village president, the village board comprises the corporate authorities, by which municipalities act. Heckman and Trustee Meinders and Trustee Miller commenced talking about village business.

At some point, Heckman engaged in an innocuous conversation with the bartender about Heckman's new tattoo. She attempted to show the tattoo on her

11

left arm to the bartender. In response, Trustee Meinders decided to make a sexually charged statement. Trustee Meinders told Heckman, "Here I thought you were going to whip your titties out and flash me." Unsurprisingly, Heckman took offense to this statement. And remember that Shannon's own ordinances prohibit sexual harassment by village officials—such as Trustee Meinders—against *any person*, which would obviously include Heckman. Trustee Meinders' statements easily fall within the village's own examples of prohibited sexual harassment, including, but not limited, to "sexual innuendos, suggestive comments, insults, humor, and jokes about sex, anatomy or gender-specific traits." Not leaving well-enough alone, Trustee Meinders' doubled down and heckled Heckman as she was leaving: "Sitting next to you all night has me horny, I'm going home to bother my wife." Again, Trustee Meinders' parting shot to Heckman clearly falls within the village's prohibition.

A few weeks later, Heckman met with President Shaner—the person that beat her in the election—and yet a third trustee (Trustee Ruter) to address Trustee Meinders' statements at the bar. So, at this point, three village trustees (Meinders, Miller, and Ruter) plus the village president (Shaner) are on notice of Meinders' statements to Heckman at the bar. At the meeting, Heckman opined that Trustee Meinders' actions and statements were retaliatory due to Heckman's participation in village board meetings. Heckman also stated that she wouldn't run for a village trustee position because of what she perceived to be retaliation. Heckman concluded the meeting by explaining that Shannon should discipline Trustee

Meinders for his statements at the bar. Heckman's request to President Shaner made sense. Per village ordinance, President Shaner was required to take care that the village's ordinances were faithfully executed.

Despite being obvious violations of the village ordinance prohibiting sexual harassment, Shannon didn't discipline Trustee Meinders. And, according to the Complaint and as reasonably inferred from the following allegations, not only did the village not discipline Trustee Meinders, it continued (or, at least, began) a retaliatory campaign against Heckman.

Just a few short days after Heckman's meeting with President Shaner and Trustee Ruter, she met with Police Chief Lewis. Again, common sense and judicial experience teach that the police chief in a hamlet of 800 residents is an important and powerful person. The Complaint's allegations bear out this teaching because, according to the Complaint, Police Chief Lewis was empowered to speak on behalf of the village with Heckman. Indeed, Trustee Ruter—who was then acting village president because of President Shaner's absence—authorized Police Chief Lewis to speak on behalf of Shannon with Heckman.

At this meeting, Chief Lewis essentially told Heckman that she needed to play ball with the village. For those so inclined to use a fancy Latin phrase, Chief Lewis told Heckman to engage in *quid pro quo*. Per Chief Lewis—acting on behalf of the village—Heckman needed to keep her mouth shut about Trustee Meinders' unseemly and ordinance-violating statements, and, in exchange, the village would look the other way on one of Heckman's alleged ordinance violations. Heckman

13

refused to play ball. Heckman's requested discipline against Trustee Meinders—which at this point was made to not only the village president and trustee but also to the Police Chief who was empowered to act on behalf of the village by the acting village president—was rejected.

Because of her refusal, this happened next. The very next day Heckman sought a variance from the village to sell ice cream from one of her businesses. Again, common sense and judicial experience counsel that this type of variance is relatively uncontroversial. After all, Heckman wasn't seeking a variance to open a cannabis dispensary or an adult entertainment venue. Viewing the facts and drawing all reasonable inferences in Heckman's favor requires this Court to view any claimed public health, safety, or welfare reason to deny the variance with a great deal of skepticism. And while Shannon was ignoring Heckman's minor variance request, the village was granting other residents' variance requests.

Meanwhile, when Chief Lewis wouldn't misrepresent the proposed *quid pro quo* of the meeting with Heckman, the village disciplined him with a hoked-up charge. The obvious implication of this action was to show Heckman that those who refused to fall in line with Shannon's demands would be punished.

On top of all of that, a short time later, President Shaner posted a derogatory comment about Heckman's six-year-old son, claiming he said horrible things based upon what he learned at home. So, not only did Heckman's child feel the brunt of President Shaner's retaliation, Shaner called her out as a bad mom. In legal terms, that's a double whammy.

14

The question then becomes whether applying common sense and judicial experience the Court can find a plausible First Amendment retaliation claim against Trustee Meinders and Shannon. The answer is "yes." Both claims are more than conceivable.

### A. First Amendment Claim Against Trustee Meinders

Viewing the allegations in favor of Heckman and drawing all reasonable inferences in her favor establishes that she has alleged a plausible First Amendment retaliation claim against Trustee Meinders. Trustee Meinders' argument for dismissal focuses on his alleged statements at the bar. He doesn't contest that Heckman engaged in First Amendment protected activity or that she suffered adverse actions that would deter future protected activity. Instead, Trustee Meinders asserts that the Complaint insufficiently alleges intent. As the Court has already found, those statements were not made under color of law. But, like any legal document, the Complaint must be read as a whole. *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013). Setting aside that in the Court's experience it is rare for a complaint to contain an allegation averring that "defendant stated it was his intent to violate plaintiff's rights," Trustee Meinders interprets the allegations in his favor and ignores the reasonable inferences drawn from the allegations.

The Complaint alleges that shortly after Heckman complained to President Shaner about Trustee Meinders' clear violation of Shannon's sexual harassment ordinance, a series of events reigned down on Heckman. She was told to play ball. But when she didn't, her variance request was ignored while another resident's

15

variance request was granted. What's more, Shannon then warned Heckman about alleged ordinance violations, while ignoring another resident's similar ordinance violations. Finally, President Shaner—who was empowered to take action against Trustee Meinders for violating the sexual harassment ordinance—then publicly shamed Heckman and her six-year-old son. It's reasonable to draw the inference that the village's punitive actions against Heckman came as soon as Heckman started complaining to President Shaner, other village trustees, and Chief Lewis (when he was acting on behalf of the village) about Trustee Meinders' statement at the bar. It's thus reasonable to infer that Trustee Meinders spurred the Village to take these actions. Causation and intent can be evidenced—especially at the motion to dismiss stage—by suspicious timing. *ACLU of Ill. V. City of Chicago*, No. 75 C 3295, 2011 U.S. Dist. LEXIS 115865, at *11 (Sep. 23, 2011) ("In other words, the fact that the Seventh Circuit held that it is not reasonable to infer retaliation when the evidence the plaintiff has proffered suggest nothing more than suspicious timing, despite ample time for discovery, does not mean that a plaintiff who fails to allege nothing more than suspicious timing will not be able to survive a motion to dismiss.").

### B. First Amendment Claim Against Shannon

Viewing the allegations in favor of Heckman and drawing all reasonable inferences in her favor establishes that she has alleged a plausible *Monell* claim against Shannon. The allegations show a series of bad acts by village trustees and the village president, inviting this Court to infer from them that the policy-making

16

level of government was bound to have noticed what was going on but failed to do anything, which encouraged or at least condoned misconduct of these officials. *See Rodriguez*, 577 F.3d at 822; *Woodward*, 368 F.3d at 927; *Estate of Vovak*, 226 F.3d at 531; *Jackson*, 66 F.3d at 152. At the pleading stage, there is enough to find a plausible First Amendment claim against Shannon. *FKFJ, Inc. v. Vill. of Worth*, No. 18 C 2828, 2019 U.S. Dist. LEXIS 9817, at *9-10 (N.D. Ill. Jan. 22, 2019) ("At this point, it is enough to note that plaintiffs allege that the Board of Trustees was directly involved in a key aspect of plaintiffs' alleged ordeal; for months it delayed approval of the special use permit plaintiffs needed to surface their parking lot, allowing the item to linger on its agenda at meeting after meeting while plaintiffs continued to receive 'hundreds' of citations.").

In addition to meeting the *Monell* requirement, Heckman has plausibly alleged that she engaged in First Amendment protected activity by attending village board meetings and then petitioning the village to take action against Trustee Meinders after his statements at the bar. Heckman also plausibly alleges she suffered adverse action that would likely deter future First Amendment activity in that the adverse actions—including the sexual harassment, refusal to punish Trustee Meinders for his sexual harassment, the refusal to grant a variance to sell ice cream, and President Shaner's shaming of both Heckman and her child—caused, among other things, Heckman not to run for trustee. Finally, the reasonable inference based upon the sequence of events and their proximity in time is that

17

Heckman's speech was at least *a* motivating factor for Shannon's retaliatory conduct.

The Village primarily focuses on the custom or practice method of showing municipal liability under *Monell*. But that's a distraction. Heckman's claim focuses on the final policymaker method, and to some extent a ratification theory. Shannon's repeated assertions that Heckman's allegations are conclusory are themselves conclusory. No doubt, some of Heckman's allegations are legal conclusions. But Shannon ignores the reasonably inferred facts the Court has identified. Instead of addressing these reasonably inferred facts, Shannon simply asserts that Heckman's allegations are conclusory. Shannon bears the burden of showing that the allegations don't plausibly state a claim. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021). Shannon hasn't met that burden.

The motion to dismiss Counts III and IV is denied.

V.  **Conclusion**

Defendants' motion to dismiss [9] is granted without prejudice as to Counts I and II. Heckman is given until March 3, 2026, to file an amended complaint. If no amended complaint is filed by then, dismissal as to these counts will convert to one with prejudice.

By March 3, 2026, Trustee Meinders and Shannon must answer Counts III and IV. By March 10, 2026, the parties must submit a proposed discovery schedule to Magistrate Judge Schneider. That proposed discovery order must indicate fact discovery will be concluded before December 18, 2026.

18

Entered: February 9, 2026                    By: _____
                                             Iain D. Johnston
                                             U.S. District Judge